# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

CHRISTOPHER CRESPO and ) 
KRISTALENA MARIE BIAFORE, ) 
                                  ) 
      Plaintiffs,           ) 
                                  ) 
      v.                    )      Case No.: CPU4-18-002645
                                  ) 
PTREBOR ENTERPRISES, LLC,  ) 
                                  ) 
      Defendant.         )

Submitted: September 26, 2019
Decided: November 25, 2019

Christopher Crespo and
Kristalena Marie Biafore
112 Glen Berne Drive
Wilmington, DE 19805
*Pro-Se Plaintiffs*

Charles J. Brown III, Esq.
1201 N Orange Street
Wilmington, DE 19801
*Attorney for Defendant*

## DECISION POST TRIAL AND JUDGMENT

**Manning, J.**

## PROCEDURAL HISTORY

On May 25, 2018, Christopher Crespo and Kristalena Marie Biafore (hereinafter "Plaintiffs") initiated a breach of contract action against Ptrebor Enterprises, LLC (hereineafter "Defendant"), to recover damages arising from a real estate transaction. On June 22, 2018, Defendant filed its Answer denying all substantive allegations and counterclaimed for attorney's fees, citing to the Agreement of Sale between the parties, should it prevail in the matter. On June 27, 2018, Plaintiffs filed their Answer to Defendant's counterclaim.

Follow various pre-trial motions, trial occurred on August 8, 2019 and September 26, 2019. On September 26, 2019, Defendant orally moved for a directed verdict, which I denied. At the conclusion of trial, I reserved decision. This is my decision after consideration of the arguments and evidence presented at trial.

## FACTUAL BACKGROUND

Seven witnesses testified on behalf of Plaintiffs. Paul Wilson (hereinafter "Wilson") is a member of Ptrebor Enterprises, LLC, and was the sole defense witness. Based on the testimony and evidence presented at trial, I find the relevant facts to be as follows:

On May 26, 2017, Plaintiffs entered into an Agreement of Sale with Defendant to purchase a property located at 12 Glen Berne Drive, Wilmington, DE 19805 (the

2

"Property").[1] Upon inspection of the Property, Plaintiffs discovered a large number of defects. On June 15, 2017, Plaintiffs and Defendant entered into an addendum to the agreement of sale in which Defendant agreed to correct the remaining defects at the seller's expense prior to closing.[2] It is uncontested that by the time of closing, seller had failed to correct the entire list of defects. On July 13, 2017, Plaintiffs and Defendant entered into a Post Settlement Agreement [3] (hereinafter "Agreement") in which Defendant agreed to remedy outstanding defects within seven (7) days. Brian Funk (hereinafter "Funk"), Plaintiff's attorney, testified that he prepared the Agreement and that Plaintiffs and Defendant agreed that $1,000.00 was to be held in escrow from the Seller's proceeds for the completion of the listed defects.[4]

The Agreement stated that the money was "from the Seller['s] proceeds for the completion of the shower and cable wrapping." A hand-written note within the Agreement further states that "Seller will complete attached addenum [sic] repairs in 7 days – list is hereby incorporated by reference." [5] At trial, Funk testified that he made the hand-written note on the Agreement at the direction of the parties.

---

[1] Pls.' Ex. 33.

[2] Pls.' Ex. 6.

[3] Pls.' Ex. 1 and 8.

[4] Pls.' Ex. 1.

[5] Pls.' Ex. 1.

On July 17, 2019, Plaintiffs sent an email to their real estate agent, Chris Pataki (hereinafter "Pataki"), asserting that Defendant failed to make multiple repairs or made repairs incorrectly.[6] On July 19, 2017, Wilson sent Pataki a response to Plaintiffs' email allegations.[7] Wilson asserted Defendant had contractors scheduled to complete the list of repairs; however, the keys in the lockbox did not correspond with any key for entry to the Property. Wilson claims contractors showed up to the Property and could not perform the work they were scheduled to complete. Further, Wilson averred Defendant could not continue to send out contractors at its expense without assurance that entry would be available. Moreover, Wilson contended Plaintiffs email listed additional repairs not in the Agreement. Wilson asserted C&S Mechanical fixed the bathroom diverter, as well as the bathroom, kitchen and toilet leaks. Furthermore, Defendant argued that aside from minor touchups, the only major items to repair were the outdoor electrical cable and attachment of the jet sprays and trim kit in the bathroom. Wilson provided a quote for the outdoor electrical cable for $450.00, and a quote for the attachment of the jet sprays and trim kit for $400.00 in materials, plus $150.00 for two hours of plumbing. Lastly, Wilson stated that he believed Plaintiffs would never be satisfied.

---

[6] Pls.' Ex. 34.

[7] Pls.' Ex. 35.

4

As such, he suggested Mr. Funk release the $1,000.00 held in escrow and Plaintiffs complete the repairs to their own liking.

Later that evening, Plaintiffs sent an email to Pataki contending Wilson's email assertions were lies.[8] Specifically, Plaintiffs averred an unknown pair of keys were placed in the lockbox. In addition, Plaintiffs assert that their friend, Tammy Snead, was present at the Property every day since settlement and only witnessed one contractor come to the Property. Further, Plaintiffs stated that while plumbers tape was affixed to the leaks in the kitchen and lower bathroom, this was not a proper fix. Moreover, Plaintiffs asserted the diverter still leaks. In addition, Plaintiffs maintained no other repairs were made since the Agreement. Lastly, Plaintiffs offered to take time off and let contractors into the Property to do the outstanding work under supervision.

On July 20, 2017, Pataki sent an email to Wilson requesting Defendant make the repairs it agreed to on July 13, 2017.[9] That same day, Wilson responded that Defendant had attempted to fulfill the Plaintiffs' requests but hired contractors had been unable to gain access to the property at the time of service and thus, Defendant could not proceed any further.[10] Soon after, Pataki countered that Wilson was

---

[8] *Id.*

[9] Def.'s Ex. 2.

[10] *Id.*

5

making excuses and access had been provided.[11] Specifically, Pataki stated that he opened the door for the plumber on July 17, 2017 and that a key to the front door was placed in the combo lockbox that day. Wilson responded once more, claiming he had made no excuses and Plaintiff's additions to the list of repairs had caused a frustration of purpose.[12]

On July 25, 2017, Wilson sent an email to Pataki stating that the access issue had not been addressed and thus, Defendant could not send contractors to the property to complete the repairs.[13] Further, Wilson asserted that all repairs were completed in the living room, front bedroom, laundry room, main living space, basement bathroom, outside entrance, exterior, pool ground and miscellaneous. Moreover, Wilson argued Plaintiffs made additional requests that did not conform to the Agreement. Specifically, Wilson referred to Plaintiff's request for the addition of silicon to the sinks, a threshold in the breezeway, drop ceiling tiles, cosmetic changes to the fence around the pool and paint color not matching. Again, Wilson suggested Plaintiffs take care of the remaining repairs. Wilson stated that his issues were access, Plaintiffs additions to the already agreed upon list, Plaintiffs continued

---

[11] *Id.*

[12] *Id.*

[13] Def.'s Ex. 1.

6

dissatisfaction, the issue of scheduling a time for contractors to access the Property, and the extension of the escrow.

At trial, Lisa Hartzel testified that she has been a code enforcement officer for thirteen years. Hartzel indicated she inspected the property in October 2018 and discovered that the HVAC unit was installed without permits.[14]

Chris Pataki, realtor for the Plaintiffs, testified at trial that the front door of the Property had an electric lock box and the breezeway entrance of the Property had a combination lock box. Further, Pataki stated that on July 17, 2017, he used one of the lock boxes to let a plumber into the Property.

Tammy Snead, a friend of the Plaintiffs, testified at trial that she was present at the Property during the day from July 17th thru July 20th. Snead would arrive around 8 or 9 am every morning and would leave in the late afternoon when Plaintiffs came home to the Property. During this period Snead only witnessed one contractor come to the Property for about two or three hours. Although Snead spoke with the contractor, she could not recall the contractor's trade or the kind of work he performed in the time that he was there.

During trial, Wilson went over the list of alleged outstanding defects. Wilson testified that any outstanding defects were not repaired because access to the Property was not given to the contractors that he had sent over. Wilson asserted that

---

[14] Pls.' Ex. 2 and 3.

7

the drywall tape in the in law suite was not painted, the sink in the in law suite kitchen was not siliconed in, one of the ceiling fans in the breezeway was not working properly, the door in the breezeway still needed magnetic strips, and the exterior corroded main power cable and tension cable was not repaired or replaced. Moreover, Wilson indicated that a plumber was let into the Property to correct the main kitchen sink leak and attach the sink to counter, repair the upstairs bathroom bathtub diverter, correct the upstairs bathroom toilet plumbing, repair the basement bathroom plumbing and fixture, and correct the basement bathroom sink leak.

Plaintiff Christopher Crespo (hereinafter "Crespo") testified that all items listed in the addendum denoted by a checkmark had been fixed. However, Crespo testified that the following items remained outstanding after seven days:

**In law suite**

#1 Porch light not fixed

#3 Paint drywall tape in closet

**Kitchen**

#6 Correctly attach sink with silicone in kitchen ( Pls.' Ex. 29. )

**Crawlspace**

#9 Proper venting not added to crawl space ( Pls.' Ex. 31. )

#10 Standing water not removed

#12 HVAC unit not modified to allow air filter changes

8

**Breezeway**

#13 One ceiling fan not fixed

#14 Door frame not fixed ( Pls.' Ex. 10. )

#16 Door sticks when opening, still need magnetic strips ( Pls.' Ex. 9. )

**Main Kitchen**

#19 Sink leaking and not attached to counter ( Pls.' Ex. 30. )

**Living Room**

#1 Correct leak in ceiling ( Pls.' Ex. 11. )

**Upstairs Bathroom**

#4 Pedestal sink not secure

#5 Diverter in bathtub does not work ( Pls.' Ex. 13. )

#6 Correct toilet plumbing, water keeps running, fix bath tub spout

( Pl. Ex. 14. )

#7 Add ventilation fan, repair to skylight ( Pls.' Ex. 15 and 16. )

**Basement**

#10 Remediate mold under shelving and in cedar closet in laundry room

**Main Living Space**

13# Correct water main leak and replace corroded plumbing in main living

space ( Pls.' Ex. 17. )

**Bathroom**

#16 Complete plumbing and fixtures in bathroom ( Pls.' Ex. 18 and 19. )

#17 Add ventilation fan ( Pls.' Ex. 20. )

#18 Correct leak under sink in bathroom ( Pls.' Ex. 21. )

**Outside entrance**

#19 Correct flashing above doorway, caulking poorly done and not completely covering wood ( Pls.' Ex. 22. )

#20 Correct damage door trim ( Pls.' Ex. 23. )

#22 Fill crack between patio and base of house with outdoor caulk ( Pls.' Ex. 24. )

**Exterior**

#1 Repair/replace corroded main power cable and tension cable ( Pls.' Ex. 25. )

#3 Correct roof shingles to overhang by at least an inch and add flashing ( Pls.' Ex. 26. )

**Pool Grounds**

#7 Correct broken fence post and ensure 4 foot fencing around perimeter of pool area ( Pls.' Ex. 27. )

**Miscellaneous**

#8  HVAC units to be service by HVAC contractor, one unit did not work, other is extremely loud ( Pls.' Ex. 3. )

#9  Complete installation of water heaters ( Pls.' Ex. 28. )

Plaintiffs submitted into evidence numerous photographs and two estimates for the costs to repair some of the outstanding defects to the Property. Damian Davis (hereinafter "Davis") testified at trial that he is a licensed general contractor and twelve-year owner of Orjam Construction, Ltd. (hereinafter "Orjam"). Davis testified that on August 1, 2017, he did a walkthrough of the Property and drafted a written general estimate of the cost to repair various defects.[15] Davis did admit in his testimony that the estimate list he created was vague. Further, Davis disclosed that the estimate he provided for the repair of the roof was given without looking on the roof. However, Davis recalled observing the diverter leaking in the upstairs bathroom shower, the celling not vented outside in the upstairs bathroom, tile installed improperly in the basement bathroom, a fan not installed in the basement bathroom, the kitchen sink in the in law suite installed incorrectly, and a breeze way fan sounded improper. The quote to repair the leaking diverter was $150.00; install the fan and vent in the upstairs bathroom was $750.00; install the fan and vent in the

---

[15] Pls.' Ex. 4.

11

basement bath was $600.00; install and silicon the kitchen sink was $350.00; and install new breezeway fan was $395.00.

Jose Mercado (hereinafter "Mercado") testified at trial that he is a general contractor for National Home Improvement LLC (hereinafter "NHI"). On August 14, 2019, Mercado provided Plaintiffs with an estimate to repair defects on the Property.[16] Mercado indicated that no ventilation existed in the in law suite crawl space. Specifically, Mercado testified that the cheapest way to remedy the issue is to cut a hole in the crawl space access door. However, the provided $250.00 quote was for the addition of a fan. Moreover, Mercado stated that he did not look at the Property to know its condition when he prepared the estimate.

Crespo indicated that he could not afford a contractor to remedy the outstanding defects and had to do some of the repairs himself. Crespo estimated that it took him 100 hours to make repairs and cost $1,000.00 in materials.

During closing arguments, Defendant raised the defense of impossibility— although he never actually used the word impossibility. Defendant contended that Wilson's attempt to make repairs to the Property was frustrated by his inability to gain access to the Property. Defendant argued, in essence, that his inability to access

---

[16] Pls.' Ex. 5.

the interior of the house on various occasions made fulfillment of the terms of the contract impossible.

## STANDARD OF REVIEW

As trier of fact, the Court is the sole judge of the credibility of each fact witness and any other documents submitted to the Court for consideration.[17] If the Court finds that the evidence presented at trial conflicts, then it is the Court's duty to reconcile these conflicts—if reasonably possible—in order to find congruity.[18] If the Court is unable to harmonize the conflicting testimony, then the Court must determine which portions of the testimony deserve more weight in its final judgment.[19] In ruling, the Court may consider the witnesses' demeanor, the fairness and descriptiveness of their testimony, their ability to personally witness or know the facts about which they testify, and any biases or interests they may have concerning the nature of the case. [20] In civil actions, the burden of proof is by a

---

[17] *See Nat'l Grange Mut. Ins. Co. v. Davis,* 2000 WL 33275030, at \*4 (Del. Com. Pl. Feb. 9, 2000).

[18] *See id.*

[19] *See id.*

[20] *See State v. Westfall,* 2008 WL 2855030, at \*3 (Del. Com. Pl. Apr. 22, 2008).

13

preponderance of the evidence.[21] "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists." [22]

## DISCUSSION

**A. Indefinite Terms**

Under Delaware Law, "[a] valid contract requires the parties' intent to be bound accordingly, and therefore, the contract must include sufficiently definite terms, and be supported by consideration. The touchstone is whether a reasonable negotiator asserting the contract's existence would have concluded that the parties reached agreement on every essential term and that negotiations were concluded." [23] "[C]ontract…means a legal conclusion that the parties have reach an agreement with respect to all material terms and have expressed an intention to bind themselves to perform the promised acts." [24]

Under the addendum, Defendant agreed to complete a list of repairs on the Property within seven days of signing. At trial, both Wilson and Crespo reviewed the list of outstanding items. It soon became evident that both parties had different interpretations for exactly what repair had been agreed to for some of the items.

---

[21] *See Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010).

[22] *See Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967).

[23] *Bryant v. Way*, 2012 WL 1415529, at *10 (Del. Super. Apr. 17, 2012).

[24] *Id.*

14

For example, the parties agreed Defendant would have "proper venting" added to the crawl space. During trial, Crespo testified the build up of humidity and moisture from the lack of ventilation damaged items kept in the crawl space. Defendant did not give testimony or submit evidence into the record to refute Plaintiffs' claim that this item was not completed. However, the vague language of this item leaves Defendant's obligation up to interpretation. NHI gave the Plaintiffs an estimate of the cost to add ventilation to the crawl space. Mercado testified this estimate would be for the installation of a fan to circulate air in the space. However, Mercado indicated a cheaper course of action would be to cut a hole in the crawl space access door. An estimate for this cheaper option was not made or entered into evidence. Clearly, there are numerous ways to add proper ventilation to an area. The installation of a fan is one of them. However, the Agreement did not specifically call for the installation of a fan. With a cheaper recourse available and vague description of what is to be expected from the Defendant, I am in no position to rewrite the Agreement terms to fit Plaintiffs interpretation or expectation of what is "proper ventilation." Because I find this term to be indefinite, I cannot award damages.

The parties agreed Defendant would have the main kitchen sink leak repaired and attached to the counter. During trial, Wilson testified the plumber was let into the Property to fix this item. Plaintiffs entered into evidence a close-up photograph

15

depicting where the main kitchen sink and counter meets. It is evident that no silicone is present between the sink and counter. However, the item description in the Agreement does not call for Defendant to have the main kitchen sink and counter siliconed. Instead, the Agreement calls for the attachment of the sink and counter, and Plaintiffs have not submitted evidence in the record indicating the sink and counter is not attached. Because I find the language "attached" to be indefinite, I cannot find Defendant breached this term.

## B. Breach of Contract

Plaintiffs allege Defendant breached the Agreement, resulting in damages in excess of $30,000.00.[25] Defendant alleges it substantially completed the items listed in the Agreement and was prevented by Plaintiffs from completing the outstanding items. Further, Defendant asserts the amount for the alleged incomplete work does not exceed the $1,000.00 that was escrowed for the items in the Agreement.

To prevail on a claim for breach of contract, the movant must establish three elements by a preponderance of the evidence: (1) a contract existed between the parties; (2) breach of an obligation imposed by the contract; and (3) damages.[26]

There is no dispute that the Agreement constitutes a valid contract.

---

[25] Pls.' Civ. Case Mgmt. Order.

[26] *Gregory v. Frazer,* 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010); *VLIW Technology, LLC v. Hewlett-Packard, Co.,* 840 A.2d 606, 612 (Del. 2003).

16

While some of the listed items in the Agreement are open to interpretation, others are sufficiently definitive to be enforceable. The parties agreed Defendant would have the pedestal sink in the upstairs bathroom secured, modify the HVAC unit to allow air filter changes, remediate the mold in the basement, correct the damaged door trim of the outside entrance, correct the flashing above the doorway and correctly apply caulk to cover the wood, fill the crack between the patio and base of the house with outdoor caulk, have the standing water removed from the crawl space, correct the leak in the living room ceiling, correct roof shingles to overhang by at least one inch and add flashing, correct the broken fence post and ensure four (4) foot fencing around the perimeter of the pool area, complete the installation of water heaters, and have a HVAC contractor service the HVAC units. During trial, Wilson testified that all these items were done. However, Crespo testified that these items were not completed by the Defendant properly or at all.

Regarding the upstairs bathroom pedestal sink, filter changes for the HVAC unit and mold in the basement, I find that Plaintiffs have met their burden in proving that these items were not remedied. However, proof of damages was not established and therefore cannot be awarded.

With respect to the outdoor damaged door trim, flashing above the outside entrance doorway, outside entrance wood with no caulk, and crack between the patio and base of the house with no caulk, Plaintiffs submitted unclear close up

17

photographs that I could not discern. All I have to consider is conflicting Plaintiffs' and Defendant's testimony. Thus, I do not find that Plaintiffs met their burden in proving these items were not done. Even if they had, damages were not established.

Crespo testified the sump pump in the crawl space was not installed properly causing water to accumulate. When asked whether the standing water was removed, Crespo testified it had not been removed because the sump pump does not work. However, the item description does not require that Defendant install a sump pump. Instead, it requires Defendant remove the standing water. Plaintiffs submitted no evidence into the record indicating that the standing water was not removed in the crawl space. All I have to consider is the Plaintiffs' and Defendant's conflicting testimony. I do not find that Plaintiffs met their burden in proving this item was not done; even if it was, I am unable to determine damages with any reasonable certainty.

Crespo testified Defendant failed to correct roof shingles to overhang by at least an inch and add flashing. Plaintiffs submitted a clear close up photograph illustrating roof tiles that are almost flush with the edge of the roof. In consideration of the testimony and evidence presented at trial, I find Plaintiffs have established that Defendant failed to repair this item. Again, however, Plaintiffs have failed to establish how much it would cost to fix this item so no damages can be awarded.

18

Crespo testified Defendant failed to correct the broken fence post and ensure four (4) foot fencing around the perimeter of the pool area. Plaintiffs submitted a clear close up photograph illustrating that the bottom portion of the fence was damaged. In consideration of the testimony and evidence presented at trial, I find Plaintiffs have established that Defendant failed to repair this item.

Crespo testified Defendant failed to install the water heater properly. More specifically, Crespo testified the water heater exhaust was not the correct size, which caused a malfunction with the heat. Plaintiffs submitted a before photograph illustrating what the water heater exhaust looked like once Defendant completed the installation, as well as an after photograph of a new exhaust installed to remedy the malfunction. In consideration of the testimony and evidence presented at trial, I find Plaintiffs have established that Defendant failed to repair this item, but again, I am unable to determine damages.

Crespo testified Defendant did not have an HVAC contractor service the HVAC units. Specifically, Crespo testified the HVAC units were not to code and had to be repaired to pass inspection. Moreover, code enforcement officer Hartzel testified the HVAC units were installed without permits, and on February 27, 2019, Plaintiffs were sent a warning. Further, Plaintiffs submitted a photograph of the HVAC units, and Hartzel positively identified them as the units she inspected on the Property. In consideration of the testimony and evidence presented at trial, I find

19

Plaintiffs have established that Defendant failed to properly repair this item. However, again, I am unable to award any damages based on the evidence Plaintiffs' presented.

The parties agreed Defendant would repair the diverter in the upstairs bathroom bathtub, correct the toilet pluming and fix the bath tub spout in the upstairs bathroom, correct the water main leak and replace corroded plumbing in the main living space, have the plumbing and fixtures in the bathroom completed, and correct the leak under the bathroom sink. During trial, Wilson testified the plumber was let in the Property to fix these items. However, Crespo testified these items were not completed by the Defendant or not completed properly.

Crespo testified the Defendant failed to repair the diverter in the upstairs bathroom bathtub. More specifically, Crespo testified eighty percent (80%) of the water flows through the shower head, while twenty percent (20%) leaks out. Plaintiffs have established that Defendant failed to fix this item and damages can be determined per the Orjam estimate.

Crespo testified the Defendant failed to correct the water main leak and replace corroded plumbing in the main living space. Plaintiffs submitted a close up photograph illustrating a valve. However, the photograph does not indicate the main leak was not repaired or that the plumbing was not replaced. All I have to consider

20

is contrasting Plaintiffs' and Defendant's testimony. Thus, I cannot find that Plaintiffs met their burden in proving this item was not done.

Crespo testified Defendant failed to have the plumbing and fixtures in the bathroom completed. Specifically, Crespo testified the sink was still leaking, fixtures were not added, and pipes were sticking out of the wall with broken tile. Crespo testified he installed fixtures at a later date. However, he could not find one to fit the foot wash hole. Plaintiffs submitted a before and after photograph of a bathroom shower. The before depicts pipes sticking out of the wall and an absence of fixtures. The after photo depicts the same shower with no pipes sticking out and fixtures added, with the exception of a fixture at the bottom of the shower wall. Defendant did not give testimony or submit evidence into the record to refute the claim that this item was not completed. In consideration of the testimony and evidence presented at trial, I find Plaintiffs have established that Defendant failed to repair this item.

Crespo testified Defendant failed to correct the leak under the bathroom sink. Plaintiffs submitted a close up photograph depicting a pipe with a damp paper towel underneath. It is evidence from the photograph that there is a leak. Defendant did not testify or enter evidence into the record contesting that this item was in fact completed by the plumber. In consideration of the testimony and evidence presented at trial, I find Plaintiffs have established that Defendant failed to repair this item.

21

Lastly, the parties agreed Defendant would add a ventilation fan and repair the skylight in the upstairs bathroom. During trial, Crespo testified the ventilation fan had not been added, nor was the skylight leak repaired. Plaintiffs submitted photographs of the upstairs bathroom ceiling. The photograph does not suggest that the skylight leak was not repaired, as there is no presence of dripping water, saggy drywall or plaster. Therefore, I cannot find Plaintiffs met their burden in proving Defendant failed to repair the skylight leak. However, the photograph does indicate Defendant failed to add a ventilation fan. Defendant did not testify or enter evidence into the record to refute Plaintiffs testimony and evidence. Thus, I find Plaintiffs proved Defendant failed to add a ventilation fan.

## C. Impossibility Defense

"Under Delaware law, an impracticability/impossibility defense requires the showing of '(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance."[27] "There can be no invocation of the impossibility defense

---

[27] *Bobcat North America, LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *9 (Del. Super. April 26, 2019) citing to *Chase Manhattan Bank v. Iridium Africa Corp.*, 474 F. Supp. 2d 613, 620 (D. Del. 2007).

22

if 'the supervening events were 'reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement.'" [28]

Here, the parties agreed Defendant would fix a list of items within seven days. Defendant is in the business of buying and flipping houses. Wilson admitted that Defendant did not complete numerous items on the list, arguing that Plaintiffs prevented him from doing so. Wilson testified Defendant's contractors could not access the property to complete these items in the Agreement. Wilson's email correspondences with Pataki regarding the list asserts this argument as well. However, Wilson made no attempt in his communication with Plaintiffs' relator to resolve the alleged access issue. In fact, Wilson asserted Plaintiff would "never be satisfied" and suggested the $1,000.00 in escrow be released, so he could, in effect, disown the matter.[29] On July 25, 2017, Wilson sent his last email in an effort to end the relationship and get out from the Agreement, stating "[i]t just seems simpler to have your client take care of [the repairs] at this point." In its closing statement, Defendant testified it was given no opportunity to address the items Plaintiffs believe were not completed. However, Wilson's email correspondences contradict this testimony. Plaintiffs and Pataki clearly outlined the many items on the list that were

---

[28] *Id.* citing to *William Nat. Gas Co. v. Amoco Prod. Co.*, 1991 WL 58387, *13 (Del. Ch. Apr. 16, 1991).

yet to be completed by Defendant. Moreover, Pataki's and Snead's testimony rebut Defendant's argument that his contractors had no access to the Property. Specifically, Pataki testified two lockboxes gave access to the Property. In fact, he used one of them to let in a plumber. Snead testified she was present during four of the days that Defendant agreed to finish the outstanding items, from morning to the time Plaintiffs' came home. However, Snead testified she observed only one contractor come to the Property for two or three hours.

I am not persuaded that it was somehow *impossible* for Defendant to have completed the agreed upon repairs and Defendant has failed to establish the elements of this defense. Wilson testified at trial that he is in the business of repairing and re-selling houses. Certainly, he could have — and indeed should have — foreseen access to the home as a potential problem. Furthermore, the evidence shows that completion of the remaining items, although perhaps somewhat inconvenient, was certainly not impossible. Based on his attitude and demeanor at trial, the more credible explanation is that Wilson was simply tired of dealing with the Plaintiffs and did not want to be bothered with their demands any longer.

**D. Damages**

"Damages for a breach of contract must be proven with reasonable certainty. Recovery is not available to the extent that the alleged damages are uncertain,

24

contingent, conjectural, or speculative.[30] "[T]he plaintiff may recover any incidental or consequential losses that arose as a result of the breach."[31]

Plaintiffs struggled throughout the trial to present their case in a logical manner that focused on the relevant items under the Agreement. Plaintiffs' scatter-shot presentation has made sorting through the evidence difficult—to say the least. Additionally, Plaintiffs failed to establish specific damages for many of the incomplete items in the Agreement. To this point, however, Plaintiffs did presented the two estimates as noted above. The Orjam estimate lists repairs for some items either not in the Agreement or beyond the scope of the agreement. Therefore, I can only use the Orjam estimate to ascertain the cost to fix the upstairs bathroom shower and install a vent fan at $1,225.00, repair the damage caused by roof leaks to the living room ceiling at $400.00, and install a new fan in the breezeway at $395.00. Damages are awarded in these amounts respectively.

Further, the NHI estimate included items not in the Agreement. The only relevant NHI estimate was for the crawl space. As previously stated, the crawl space ventilation item is too vague to be enforceable in my opinion. Thus, I cannot use the NHI estimate to award damages.

---

[30] *Mayhorn v. Talley-Siders*, 2017 WL 4122580, at *5 (Del. Com. Pl. September 5, 2017) citing to *Dill v. Dill*, 2016 WL 4127455, at *1 (Del. Super. Aug. 2, 2016).

[31] *Id.* citing to *Devincentis v. European Performance, Inc.*, 2012 WL 1646347, at *3 (Del. Super. Apr. 17, 3012).

25

Crespo testified Plaintiffs could not afford a contractor to remedy all of the issues. Thus, he spent time doing some of the repairs himself. Crespo estimated that it took him 100 hours and cost him $1,000.00 in materials to make the repairs he was able to accomplish. However, he did not testify or present any evidence to establish which repairs he made, whether all the repairs he made were items actually included under the Agreement, or what materials he purchased to make the repairs. In fact, the only material he testified to purchasing was caulk. Therefore, I cannot award Plaintiffs damages based solely on this vague testimony.

In his July 19, 2017 email, Wilson provided a $450.00 quote for the outdoor electrical cable and a $550.00 quote ($400.00 in materials, plus $150.00 for two hours of plumbing) for the attachment of the jet spray and trim kit in the basement bathroom shower. I find it highly suspicious, and obviously self-serving, that the total value of the outstanding work Wilson admitted he failed to complete exactly equaled the $1,000.00 held in escrow. Nevertheless, I award damages of $450.00 and $550.00 respectively.

**E. Fraud, Negligent Misrepresentation, and Covenant of Good Faith and Fair Dealing**

I do not find Plaintiffs proved fraud, negligent misrepresentation or a breach of the covenant of good faith and fair dealing by a preponderance of the evidence — those claims are therefore dismissed.

26

## CONCLUSION

For the foregoing reasons, I find that Plaintiffs have established their claim for breach of contract by a preponderance of the evidence. Accordingly, Defendant's counterclaim for attorney's fees is DENIED.

Judgment is hereby entered against Ptrebor Enterprises, LLC in the amount of $3,020.00 (three thousand and twenty US dollars), plus costs, post judgment interest at the legal rate, and attorney's fees.

**IT IS SO ORDERED**

Bradley V. Manning,
Judge


cc:    Pat Thomas, Judicial Case Manager